IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

NEXT TECHNOLOGIES, INC.,

                                  Plaintiff,

      v.

BEYOND THE OFFICE DOOR LLC d/b/a
BTOD.COM,

                                  Defendant.

OPINION AND ORDER

19-cv-217-wmc

Plaintiff Next Technologies, Inc. ("Next") and defendant Beyond the Office Door LLC ("BTOD") are in the business of selling office furniture, including standing desks. BTOD also posts online product reviews of office furniture on its blog, "The Breakroom Blog." (Def.'s PFOF (dkt. #38) ¶ 2.) In this lawsuit, Next claims that BTOD defamed its products in two reviews, as well as tortiously interfered with existing and potential contractual relationships.[1] On the same day that BTOD filed a motion for summary judgment on all of plaintiff's claims (dkt. #21), plaintiff moved to amend its complaint to add a Lanham Act claim (dkt. #25). For the reasons discussed below, the court will deny plaintiff's motion to amend its complaint and grant defendant's summary judgment motion.

---

[1] Plaintiff originally filed suit against two defendants -- BTOD and Gregory Knighton, the owner of BTOD. (Compl. (dkt. #2) 1.) However, on May 4, 2020, the parties submitted a joint stipulation of dismissal of all claims against Knighton personally. (Joint Stip. of Dismissal (dkt. #42).) As reflected in the caption above, the court granted this motion and dismissed Knighton. (Order (dkt. #43).)

FACTS[2]

## A. Terra Article

On November 1, 2017, BTOD posted a product review article entitled "Top 8 Problems and Solutions with NextDesk Terra Standing Desk" (the "Terra Article"). (Compl., Ex. A (dkt. #2-1) 2.)   The review was authored by Greg Knighton, the owner of BTOD.   (*Id.*)   The parties do not dispute the contents of the article, but do dispute the accuracy of various facts asserted in the article, which are summarized below.

### 1.  Stability

The Terra article includes a section with the heading of "Stability Issues At All Heights," which states in part that "the NextDesk Terra had great lateral stability. . . . Unfortunately, the front to back rocking motion was the worst I have tested. . . .   This flexing was so bad that it was noticeable when the desk was at sitting height."   (*Id.* at 3.) The article also includes an embedded youtube video.   (*Id.*; Def.'s PFOF (dkt. #38) ¶ 16.) According to defendant BTOD, the video "provides visual context for the 'front to back rocking motion' described in the Terra Article."   (Def.'s PFOF (dkt. #38) ¶ 17.)   Further, defendant maintains that Knighton tested the Terra's front-to-back stability at heights most consumers use and found similar stability issues through all useable heights, including a rocking motion that Knighton observed and felt was the worst he had seen.   (Def.'s Supp.

---

[2] The following facts are drawn from the parties' proposed findings of facts, and the responses and replies to those proposed facts.   (*See* Def.'s Reply to Pl.'s Resp to Def.'s Proposed Findings of Fact (hereinafter "Def.'s PFOF") (dkt. #38); Def.'s Resp. to Pl.'s Supp. Proposed Findings of Fact (hereinafter "Pl.'s Supp. PFOF") (dkt. #39); Def.'s Supp. Proposed Findings of Fact (hereinafter "Def.'s Supp. PFOF") (dkt. #40).)   If not otherwise indicated, the facts summarized below are undisputed for the purposes of summary judgment.

PFOF (dkt. #40) ¶¶ 11-12.)

In response, plaintiff asserts the following:   (1) Knighton did not take any measurements of the alleged rocking motion; (2) the Terra does *not* have stability issues; (3) Knighton admitted that he did not level the desk; and (4) plaintiff conducted a test of stability of the Terra at 32 inches and 42 inches *without* experiencing any issues with stability.  (Def.'s PFOF (dkt. #38) ¶ 17.)

### 2.  Color

The next section of the article was titled "Mismatched Color Frame/Feet" and states:

> When going through the options at checkout, I decided to go with the more expensive silver gloss finish option. . . .  When I received the desk, the first thing I noticed was how different the colors were on the columns compared to the feet, cross support and upper supports.  The only parts that had a high gloss finish were the parts that NextDesk makes for the Terra. This meant the big vertical portion of the frame is a completely different color.

(Compl., Ex. A (dkt. #2-1) 4.)  This picture was also embedded in the article:



(*Id.*)  Defendant explains that it considers the columns or "legs" of a standing desk to be part of a desk's "frame."  (Def.'s Supp. PFOF (dkt. #40) ¶ 13.)

Plaintiff agrees that the photo accurately depicts the Terra desk in the silver gloss finish, but contends that the lifting columns and the aluminum frame are the same color -- silver.  (Def.'s PFOF (dkt. #38) ¶ 9.)  Plaintiff also acknowledges that the lifting columns have a different *finish* than the desk's other metal components, but disputes that this means that the "frame" is mismatched.  (Pl.'s Opp'n (dkt. #31) 12.)  According to plaintiff, the "frame" of a standing desk includes only "the metal parts other than the lifting columns," meaning the "frame" of the Terra *is* a consistent gloss finish in silver.  (*Id.* at 12; Schmit Decl. (dkt. #31-1) ¶ 11.)  Finally, plaintiff points out that Knighton only ordered one color and, therefore, had no basis to determine whether the other colors offered were

"mismatched."  (Def.'s PFOF (dkt. #38) ¶ 9.)

### 3.  Anti-Collision Protection

The article also states that the Terra Desk lacks an anti-collision system.  (Compl., Ex. A (dkt. #2-1) 6.)   According to defendant, such a system "disables the lifting mechanism if a standing desk comes into contact with stationary objects while lifting or lowering."  (Def.'s PFOF (dkt. #38) ¶ 23.)  Plaintiff offers a different definition, stating that an anti-collision system "enables the desk to stop and reverse course if the Terra encounters a solid object when being raised or lowered."  (*Id.*)   However, the parties' dispute is over more than mere definitions.

In particular, defendant states that the technology used by the Terra desk required a small plug, called a "dongle," which when inserted into a port on the control panel enabled the anti-collision feature, and the Terra desk reviewed by Knighton did not include a dongle.  (*Id.* ¶¶ 25-27.)  Plaintiff acknowledges that at one point the Terra desk *did* require a dongle for its anti-collision feature, and further acknowledges that the desk inspected by Knighton did not have one.  (*See id.*)  However, plaintiff maintains that before January 1, 2017, *and* in particular, before Knighton's purchase of the Terra, Next had arranged for the controller to be programmed with an anti-collision function, meaning a dongle was no longer required to enable it.  (*Id.*)  Without disputing this assertion, defendant disputes plaintiff's assertion that the Terra reviewed by Knighton did not require a dongle for anti-collision functions on two grounds.  First, "[u]pon information and belief," rather than citation to evidence, defendant states that the controller for Defendants' Terra is stamped "2014."  (*Id.* ¶ 26.)  Second, even assuming a dongle was not required, defendant points

out that Knighton testified to conducting an anti-collision test by pushing down on the corners while it was raising or lowering to see if would stop and concluded that it did not have collision avoidance.  (Def.'s Supp. PFOF (dkt. #40) ¶ 14; Knighton Dep. (dkt. #31-12) 206:17-20.)

### 4.  Overload Protection

Plaintiff further takes issue with the assertion that the Terra has "no overload protection."  (Compl., Ex. A (dkt. #2-1) 6.)  According to defendant:  (1) "overload protection" is "a feature that disables the lifting mechanism of a standing desk if it encounters weight substantially in excess of the listed lifting capacity"; (2) the Terra's maximum lifting capacity is 315 pounds; (3) in testing the Terra, Knighton placed 360 pounds on the desk and the lifting mechanism still engaged; and (4) because the lifting mechanism engaged even when the desk was loaded with weight exceeding the stated lifting capacity, Knighton concluded that was no evidence of an overload protection feature. (Def.'s PFOF (dkt. #38) ¶¶ 18-22.)

Plaintiff does not appear to dispute defendant's third point, but disputes the remaining facts.  (*See id*.)  First, plaintiff disagrees with defendant's definition of "overload protection" -- according to plaintiff, "overload protection" prevents a standing desk from lifting weight that would exceed the *operational* capacity of the mechanical components, not the *listed* weight capacity.  (*Id.* ¶ 18.)  Second, plaintiff represents that the Terra has a maximum lifting capacity greater than 315 pounds, and that the desk can lift in excess of 400 pounds before the overload protection engages.  (*Id.* ¶ 20.)  Finally, plaintiff explains that when the loaded weight exceeds the desks *operational* capacity, the overload protection

system is engaged.  (*Id.* ¶ 21.)  Specifically, an error message of E02 or E03 is displayed on the controller when this occurs.  (*Id.*)  In response to these facts, defendant simply reiterates that Knighton's testing revealed no overload protection system and argues that plaintiff's proffered evidence does not contradict defendant's statements in the Terra article.  (*Id.* ¶¶ 19-22.)

### 5. Website Information

The article includes a section titled "Inaccurate Information Throughout the NextDesk.com Website," maintaining that "[t]here was a ton of content surrounding the use of recycled aluminum" but the Terra uses the DL4 Linak column, which "has only been constructed from steel."  (Compl., Ex. A (dkt. #2-1) 3.)  The section continues by stating: "No matter what I said to them about Linak and the series being used, they maintained a firm stance on the Terra being an aluminum product.  It wasn't until I called and left a message for management that someone at NextDesk acknowledged this was incorrect. . . . Going to NextDesk will likely leave you with over-hyped marketing, that is dated or just plain wrong."  (*Id.*)

The parties agree that the feet, cross supports, and upper supports of the Terra *are* made of aluminum.  (Def.'s PFOF (dkt. #38) ¶ 10.)  The parties further agree that the lifting columns are made from steel.  (*Id.* ¶ 11.)  They otherwise fail to agree on all other material proposed facts related to the desk's makeup.  (*See id.* ¶¶ 12-13.)

Knighton represents that he made "multiple attempts to verify that [the] upright columns of the Terra were composed of steel as opposed to aluminum."  (*Id.* ¶ 12; Knighton Decl. (dkt. #26) ¶ 3.)  Plaintiff purports to dispute this, but fails to point to any evidence

contradicting Knighton's testimony.   (Def.'s PFOF (dkt. #38) ¶ 12.)   Defendant also
attaches a chat conversation in which Knighton posed a series of questions to a Next
representative:

> Q. Hi Robert. I was just chatting with Christopher. . . I asked
> him if the uprights of the NextDesk Terra are steel or
> aluminum.
> A. They are aluminum, with some steel parts inside.
> Q. So the outer frame/column is made from steel?
> A. I believe that it is made of aluminum.
> Q. Can you verify that.
> A. I just verified that with my director.

(*Id.* ¶ 13; Knighton Decl., Ex. 12 (dkt. #26-1) 1.)   Plaintiff does not dispute the
authenticity of the reproduced chat conversation, but does dispute that the chat shows
that Next communicated incorrect information.   (*See* Def.'s PFOF (dkt. #38) ¶ 13.)   In
particular, plaintiff again maintains that the "frame" does not include the lifting columns,
and that under this definition the "frame" is in fact made from aluminum.   (*Id.*)   Defendant
replies that it (and Knighton) consider the columns to be part of the frame.   (*Id.*; Def.'s
Supp. PFOF (dkt. #40) ¶ 13.)

### 6.  Call with "Management"

As noted above, Knighton wrote in the Terra article that "[i]t wasn't until I called
and left a message for management that someone at NextDesk acknowledged [information
on its website] was incorrect."   (Compl., Ex. A (dkt. #2-1) 3.)   The parties do not appear
to dispute that Knighton spoke with an individual named "Christopher" regarding the
purportedly inaccurate information.   (Pl.'s Supp. PFOF (dkt. #38) ¶ 21.)   Plaintiff,
however, maintains that Next only employed one person named "Christopher" in 2017,

8

and he was not a manager or with management.  (*Id.*)  Plaintiff further states that no one

from Next's management apologized to Knighton for inaccuracies on Next's website.  (*Id.*

¶¶ 22-23.)[3]  Nevertheless, Knighton testified at his deposition that he spoke with someone

named "Christopher" at Next, who apologized for management.  (*Id.* ¶¶ 21-23 (citing

Knighton Dep. (dkt. #31-12) 184:23-185:1).)

### 7.  Price

Finally, the article states that the Terra Standing Desk has a "high price tag,"

"[s]tarting at over $1600 with shipping included."  (Compl. Ex. A (dkt. #2-1) 8.)

Defendant maintains that it paid over $1,600 for the Terra, with shipping included.  (Def.'s

PFOF (dkt. #38) ¶ 28.)  Plaintiff responds that the price of the Terra starts at $1,497, and

Knighton purchased a color and finish adding an extra charge of $97.  (*Id.*)

### A.  EvoDesk Article

On January 16, 2018, BTOD posted a separate review of the EvoDesk, another

Next product, titled "Top 6 Problems and Solutions for the EvoDesk Standing Desk."

(Compl., Ex. C (dkt. #2-1) 2.)  The article was again authored by Knighton and was posted

on The Breakroom Blog.  (*Id.*)  As with the Terra article, the parties dispute the accuracy

of specific statements made in the article.

---

[3] There is some question as to the relevance of this proposed fact, as the Terra article never claimed someone from Next "apologized," only that the representative acknowledged that the website information was incorrect.

### 1.  Manufactured in China

To begin, the article states that the EvoDesk "features JieCang Linear technology for the frame. . . .  While the OEM [original equipment manufacturer] JieCang offers one of the better Chinese made standing desks, the problems their frames possess could potentially be a deal breaker."  (Compl. Ex. C (dkt. #2-3) 2.)  In apparent support, the article notes that "[o]ne of the most common issues with the JieCang frame and Chinese standing desks in general is over lubrication," and "[a] common problem we have found among all Chinese desks tested has been their low quality electronics."  (*Id.* at 3, 5.)  At the same time, the parties agree that:  parts of the EvoDesk are manufactured in China; the desktop surface is manufactured in the United States; and the desk is assembled in the United States.  (*See* Def.'s PFOF (dkt. #38) ¶¶ 32-34.)

### 2.  Over Lubrication

As for the assertion of "Over Lubrication," the EvoDesk article includes a section under that title, stating that "[a]fter cycling the EvoDesk only a handful of times you will start to see the white lubricant building up on the outside of the columns."  (Compl. Ex. C (dkt. #2-3) 3.)  The article also includes this picture with the caption "White build up from lubrication in columns":



(*Id.*; Knighton Decl., Ex. 16 (dkt. #26-5) 1.))  The article continues to assert that:  "The over lubrication problem didn't just exist in the glides. This was a problem throughout the entire frame."  (Compl. Ex. C (dkt. #2-3) 3.)

According to defendant, the picture shows that lubrication in the EvoDesk does not remain centrally located at the glides but is deposited along the length of the lifting column. (Def.'s PFOF (dkt. #38) ¶ 37.)  To this, plaintiff responds:  (1) "Jiecang does not have issues with over lubrication on its lifting columns which are incorporated on the Evodesk"; (2) "Jiecang uses specialized equipment that dispenses a specific amount of lubricant and then our quality control personnel perform visual inspections"; and (3) "Jiecang has not received complaints or issues from companies to which it supplies lifting columns about over lubrication. Jiecang's components are not over lubricated."  (*Id.*)  Defendant does not dispute plaintiff's proffered facts, but rather contends that they do not contradict its own

facts demonstrating the lubrication of the EvoDesk evaluated by Knighton.  (*Id.*)

### 3.  Cost Savings

The article next explains that the EvoDesk uses a "two board design from JieCang" mainly for "cost savings."  (Compl. Ex. C (dkt. #2-3) 5.)  The parties agree that plaintiff did not design or manufacture the two board system used in the EvoDesk.  (Def.'s PFOF (dkt. #38) ¶¶ 39-40.)  However, plaintiff states that "Jiecang splits the circuit boards into two pieces solely for the purpose of efficiency and production capacity," arguing "[t]he implication that Jiecang uses this system because it is lower quality is false."  (*Id.* ¶ 38.)  Defendant does not appear to dispute plaintiff's first statement, but disputes that the EvoDesk article states or implies that the two board system is "cheap" or "lower quality." (*Id.*)  Defendant further asserts Knighton's opinion that JieCang's use of a two board system was primarily for cost savings was based on his conversation with an experienced electronics manufacturer.  (Def.'s Supp. PFOF (dkt. #40) ¶ 15.)

### 4.  Mount Accessories

Finally, plaintiff challenges the EvoDesk article statement that "[l]ooking at the T base design of the EvoDesk, where this frame is placed [is] a problem for users who plan to mount accessories."  (Compl. Ex. C (dkt. #2-3) 6.)  Defendant claims this statement is based on its own findings and conclusions that the design of the EvoDesk could be a problem for those who plan to mount accessories from a brand other than EvoDesk.  (Def.'s PFOF (dkt. #38) ¶ 43.)  Defendant further asserts that, in Knighton's experience, customers who purchase standing desks will sometimes purchase accessories for the desks

through Amazon.  (Def.'s Supp. PFOF (dkt. #40) ¶ 16.)  Yet plaintiff points out that Knighton did *not* test or mount any accessories on the EvoDesk and, therefore, had no basis to find that a problem would arise with mounting accessories on the desk.  (Def.'s PFOF (dkt. #38) ¶ 43.)  Defendant counters that no test or mount accessories were required to see that mounting accessories to the EvoDesk could be problematic based on its design.  (*Id.*)

### B.  Public Dispute Regarding Quality of Standing Desks

In 2013 and 2015, *The Wirecutter* magazine also included reviews of various standing desks, including Next's products.  In 2013, *Wirecutter* named the Terra as its "top pick standing desk."  In 2015, however, *Wirecutter* changed its top pick standing desk to the Ergo Depot Jarvis desk.  In the latter article, *Wirecutter* explained that Terra was superior in fit and finish to the Ergo Depot Jarvis, but ultimately concluded that "for most people, the Jarvis offers all of the benefits of the Terra for less than half the price."  (Def.'s PFOF (dkt. #38) ¶ 61.)  In response to the 2015 review, Next dismissed the legitimacy of *Wirecutter* and accused it of engaging in deception and making "advertisements look like journalism."  (*Id.* ¶ 57.)  Next also dismissed reviews from BTOD, stating "[t]he company built a business around promoting false reviews that bash competitors and redirect buyers to their products."  (*Id.* ¶ 65.)

Next also published its own reviews of products, including a review of the VertDesk V3 sold by BTOD.  (*Id.* ¶ 63.)  In the review, Next writes:  "We don't normally write reviews, but sometimes it's necessary to put bad people in their place.  Apparently the folks at BTOD were never taught that people who live in glass houses shouldn't throw stones."

(*Id.* ¶ 64.)   Next also includes favorable quotations from product reviews on its website.

(*Id.* ¶ 52.)   For example, Next reproduces:

- A quotation from *Maximum PC* that states the following about the Terra: "Score of 100 – Kick Ass! Absolute best-in-class adjustable desk you can buy. . . there's no other sit/stand desk [were] ever used that was this well made."  (*Id.* ¶ 53.)

- A quotation from *Digital Trends* that describes the Terra as "[o]ur favorite high-tech standing desk. Terra truly shines thanks to its superior build quality, gorgeous design, and sturdy construction. [It's] clean, sophisticated, and wildly dapper."  (*Id.* ¶ 54.)

- A quotation that describes the EvoDesk as "the Lamborghini of standing desks."  (*Id.* ¶ 55.)

- A quotation from *PC GAMER* describing the EvoDesk as stable, smooth, and "a potent and well-designed sit/stand gaming desk."  (*Id.* ¶ 56.)

More generally, Next advertised its company and products in the following ways:

- Promotes itself as "a leading innovator in the design and manufacture of power adjustable height desks" that "has a high rate of customer satisfaction with its delivery of both products and services to its customers."  (Def.'s PFOF (dkt. #38) ¶ 44.)

- Describes the Terra as "the most awarded desk ever" and an "awe-inspiring" desk that "looks beautiful and works beautifully."  (*Id.* ¶ 45.)

- Provides on its website that "[t]he goal was simple: to create a new line of adjustable height desks with more stability and more capacity than ever before."  (*Id.* ¶ 46.)

- Describes the EvoDesk as an "innovation leader" and "the most stable and powerful desk ever," with "designs that stir the soul."  (*Id.* ¶ 47.)

OPINION

## I. Motion to Amend Complaint

As noted, plaintiff filed a motion for leave to amend its complaint on January 31, 2020 -- the same day that defendant filed its motion for summary judgment. (Dkts. #21, 25.) Plaintiff's proposed amendment seeks to add a Lanham Act claim for alleged unfair competition by defendant. (Pl.'s Proposed Am. Compl. (dkt. #25-2) 24.) Specifically, plaintiff's proposed complaint alleges that defendant purchased "bad backlinks" and intentionally directed them to Next's websites. (*Id.*)

Unless entitled to amend its pleading as a matter of course or obtains the opposing party's written consent, a party may only amend its pleading with the court's leave, Fed. R. Civ. P. 15(a)(2), although leave should be freely given "when justice so requires." *Id.* Even so, where a party seeks leave to amend its pleading *after* the expiration of the deadline to amend pleadings embodied in the court's scheduling order, federal courts may require the party to show "good cause," as is the standard under Rule 16 to modify a schedule. *See e.g.*, *Trustmark Ins. Co. v. General & Cologne Life Re of Am.*, 424 F.3d 542, 553 (7th Cir. 2005) ("To amend a pleading after the expiration of the trial court's Scheduling Order deadline to amend pleadings, the moving party must show "good cause.").

Here, plaintiff argues that the court should permit it to amend its complaint because: (1) it did not learn of defendant's allegedly unlawful marketing tactics until December of 2019; (2) it then worked diligently to confirm it had a good faith basis to assert new claims; (3) once confirmed a good faith basis existed, it promptly drafted and filed an amended complaint; (4) there has been no undue delay or dilatory motive in

seeking the amendment now; and (5) defendant would not be unduly prejudiced by the amendment.  (Mot. to Am. Compl. (dkt. #25) 1-4.)  In opposing this motion, defendant argues that:  (1) plaintiff fails to proffer "good cause" for leave to amend its complaint; and (2) defendant *would* suffer significant prejudice if the court permitted plaintiff to do so. (Def.'s Opp'n (dkt. #29) 5-6.)

Although plaintiff's request comes long after this court's August 22, 2019, deadline to amend pleadings established in the scheduling order for this case, that order provides that after the deadline is past, the Rule 15 standard applies.  (Order (dkt. #18) 2.)  Still, the Rule 15 standard -- although less restrictive than the Rule 16 "good cause" standard -- is not toothless, and a request to amend may be denied on several grounds, including undue delay, undue prejudice to the party opposing the motion, or futility of the amendment.  *Sound of Music v. Minnesota Mining and Manufacturing Co.,* 477 F.3d 910, 922-23 (7th Cir. 2007).  Whether to grant a party leave to amend its pleadings is a decision left to the district court's discretion as justice requires.  *Hudson v. McHugh,* 148 F.3d 859, 864 (7th Cir. 1998).

Both plaintiff's delay and the unrelated nature of this new claim caution against granting leave to amend.  Plaintiff waited over 10 months from originally filing this lawsuit in March of 2019 before requesting to add this new and significant claim.  The motion was also filed more than 5 months after the deadline to amend pleadings freely, and only days before the dispositive motion deadline in this case.  Moreover, while plaintiff represents only "discovering" the article alerting it to the alleged unfair marketing tactics in December of 2019, as defendant points out, that article was actually published in May of 2018 on

16

the very same blog that contains the Terra and EvoDesk articles.  Therefore, a legitimate concern exits as to whether plaintiff acted with "reasonable diligence" in seeking the information allegedly leading to its new claim.

More significantly, permitting this amendment to assert an entirely different kind of legal claim at this late stage of the lawsuit *would* significantly prejudice defendant. Indeed, plaintiff's proposed, additional claim has little, if anything, to do with plaintiff's existing claims, legally or factually.  Factually, the claimed misconduct concerns manipulation of the quality of backlinks to plaintiff's website in an effort to lower its ranking by search engines, not the substance of product reviews, much less the substance of defendant's Terra and EvoDesk articles that until now have been the *only* concern of this lawsuit.[4]  Although potentially viable as a claim, it would certainly change the focus of this lawsuit.  Moreover, as discussed below, the court will grant summary judgment in favor of defendant on plaintiff's *current* claims.  Therefore, granting plaintiff's motion is the difference between the end or the perpetuation of this lawsuit.  In contrast, if the court permits this new claim to be added, discovery will almost certainly need to be reopened and the existing pre-trial and trial schedule will have to be struck and re-set.  For all these reasons, discretion at this late date supports requiring plaintiff to pursue this new and entirely different claim in a separate lawsuit.  Accordingly, the court will deny plaintiff's motion.

---

[4] *See* Blue Corona, *What Does a Bad Backlink Look Like for SEO?,* (Sept. 3, 2015) https://www.bluecorona.com/blog/what-does-a-bad-backlink-look-like/.

## II. Motion for Summary Judgment

Turning to the merits, plaintiff asserts four causes of action against defendant: (1) defamation per se; (2) defamation; (2) tortious interference with existing contractual relations; and (4) tortious interference with potential contractual relations. As explained already, the basis for these claims are allegedly false statements made by defendant about the operation of plaintiff's desks in the Terra and EvoDesk articles. Defendant now brings this motion for summary judgment, arguing that all of plaintiff's claims must be dismissed.

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Consistent with the factual summary above, the court will view all facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Even applying this favorable standard in evaluating plaintiff's claim, however, defendant has shown that there are no genuine disputes of material facts and it is entitled to judgment as a matter of law.

### A. Defamation Claims

Defendant offers three separate grounds on which to dismiss plaintiff's defamation claims. (Def.'s Br. (dkt. #22) 2.) First, defendant argues that the statements made in the articles are either opinion, true, or substantially true, and thus are not actionable. (*Id.*) Second, defendant argues that the statements cannot reasonably be interpreted as charging dishonorable, unethical, or unprofessional conduct in a profession, which defendant claims is required for defamation in a business setting. (*Id.*) Third, defendant contends that

18

plaintiff cannot show actual malice as is required given Next's "limited public figure" status. (*Id.*)  In the court's view, a reasonable trier of fact could find *some* of the statements in the articles to be demonstrably false (*e.g.*, that the Terra had no anti-collision protection) and application of a "dishonorable, unethical, or unprofessional conduct" standard for public comments made about a competitor's product on which defendant bases its second argument may be an overly generous reading of the legal standard under Wisconsin law.[5] Accordingly, the court's analysis will begin and end with the public figure privilege argument.

To prove defamation of a public figure, the plaintiff must demonstrate actual malice to prevail.  *Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 536, 563 N.W.2d 472 (1997).  This requirement is rooted in the First and Fourteenth Amendments of the U.S. Constitution, which create a conditional constitutional privilege on the publication of statements about public figures.  *Id.* (citing *Masson v. New Yorker Magazine, Inc.* 501 U.S.

---

[5] In fairness, the Seventh Circuit observed in *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158 (7th Cir. 1987), "[i]n a business setting the imputation, to count as defamation" under Wisconsin law "must charge dishonorable, unethical, unlawful, or unprofessional conduct." *Id.* at 1166.  The *Isaksen* court purported to draw this standard from *Converters Equipment Corp. v. Condes Corp.*, 80 Wis.2d 257, 258 N.W.2d 712 (1977), but that opinion held only that "words spoken of an individual or a corporation which charge dishonorable, unethical or unprofessional conduct in a trade, business or profession are capable of a defamatory meaning." *Id.* at 263.  This statement mirrors the Restatement of Torts, which explains that "[a] communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement Torts 2d, § 559.  That a statement charging dishonorable, unethical, or unprofessional conduct is *capable* of defamatory meaning is at least arguably not the same as a rule that a statement *must* charge dishonorable, unethical, unlawful, or unprofessional conduct to amount to defamation in a business setting.  Moreover, as best the court can tell, the *Isaksen* standard has neither been adopted by a Wisconsin court nor reappeared in a subsequent Seventh Circuit opinion, and there is no reason to address it here in light of the dispositive nature of defendant's public figure privilege defense.

19

496, 510 (1991); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)).  Public figures are generally defined as those who are "intimately involved in the resolution of important public questions." *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 164 (1975).  An individual "may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts," or he may "voluntarily inject[] himself or [be] drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).

### 1. Public Figure Status

In the present case, defendant contends that Next is a limited purpose public figure due to its involvement in the particular public controversy over the quality of standing desks.  (Def.'s Br. (dkt. #22) 22.)  "Whether a plaintiff is a 'public figure' or simply a private person is a question of federal constitutional law and Supreme Court rulings are controlling." *Harris v. Quadracci*, 48 F.3d 247, 250 (7th Cir. 1995).  Nevertheless, in a previous Wisconsin defamation action, the Seventh Circuit has explained that "because the Supreme Court has not defined the precise contours of who constitutes a 'public figure' and because states are entitled to provide a broader, though no more constricted, meaning to 'public figures,' resort to Wisconsin case law is appropriate in this diversity action." *Id.* (citing Restatement (Second) of Torts § 580A cmt. c (1977); *Underwager v. Salter,* 22 F.3d 730, 733-34 (7th Cir. 1994)).

Specifically, the Seventh Circuit has approved the following three-part inquiry, originally developed in Wisconsin courts, to determine whether a plaintiff is a limited public figure in a defamation action:

> (1) isolating the controversy at issue [and determining whether it was a controversy of substantial statewide public interest affecting persons beyond the immediate participants in dispute]; (2) examining the plaintiff's role in the controversy to be sure that it is more than trivial or tangential; and (3) determining if the alleged defamation was germane to the plaintiff's participation in the controversy.

*Id.* (quoting *Van Straten v. Milwaukee Journal Newspaper-Publisher*, 151 Wis. 2d 905, 447 N.W.2d 105 (Ct. App. 1989)) (alterations in original).  Whether a plaintiff is a public figure is a matter of law for the court to decide, and not an issue of fact left to the jury. *Bay View Packing Co. v. Taff*, 198 Wis. 2d 653, 676, 543 N.W.2d 522 (Ct. App. 1995) (citing *Lewis v. Coursolle Broadcasting of Wis., Inc.*, 127 Wis.2d 105, 110, 377 N.W.2d 166 (1985)).  The court must, therefore, examine each prong on summary judgment.

### a.  Public Controversy

A public controversy has been defined generally as a dispute that "has 'an impact outside of those immediately interested' in the dispute." *Bay View Packing Co.*, 198 Wis. 2d at 679 (quoting *Denny v. Mertz*, 106 Wis. 2d 636, 650, 318 N.W.2d 141 (1982)).  "[I]f the issue was being debated publicly and if it had foreseeable and substantial ramifications for non-participants, it was a public controversy."  *Id.* (quoting *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980)).  A purely private dispute, such as a celebrity divorce, does not qualify as a public controversy.  *See Time, Inc. v. Firestone*, 424 U.S. 448, 454 (1976).

Various courts have recognized that discussions over the quality of products may qualify as public controversies.  For example, in *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264 (3d Cir. 1980), the Third Circuit held that a public controversy existed where Steaks,

a retail meat company, engaged in a widespread advertising campaign to promote its sales
and defendant then made allegedly defamatory statements regarding the price and quality
of plaintiff's beef. *Id.* at 266-68, 274. The court explained:

> Consumer reporting enables citizens to make better informed
> purchasing decisions. Regardless whether particular statements
> made by consumer reporters are precisely accurate, it is
> necessary to insulate them from the vicissitudes of ordinary
> civil litigation in order to foster the First Amendment goals . .
> . . Application of the public figure rule to sellers such as Steaks,
> which through advertising solicit the public's attention and
> seek to influence consumer choice, therefore serves the values
> underlying the First Amendment by insulating consumer
> reporters and advocates from liability unless they have abused
> their positions by knowingly or recklessly publishing false
> information.

*Id.* at 280. Similarly, in *Quantum Elecs. Corp. v. Consumers Union of U.S., Inc.*, 881 F. Supp.
753 (D.R.I. 1995), the court explained that "consumer reporting involves matters of
particular interest to the public." *Id.* at 764. The court ultimately held that a public
controversy existed regarding the "consumer reporting about the health and safety risks
associated with the use of [plaintiff's] Panda Plus ozonator." *Id.* at 765.

Defendant argues that a public controversy existed over the quality of the Terra and
EvoDesk as compared to other standing desk options. (Def.'s Br. (dkt. #22) 22.) The
court agrees that the undisputed facts establish an ongoing, public debate existed regarding
the quality of standing desks. In particular, the articles and posts reviewing standing desks
from numerous publications show that there exists a "public debate" regarding the quality
of standing desks in general and of Next's standing desks in particular. (*See* Def.'s PFOF
(dkt. #38) ¶¶ 52-68.) This debate is evinced in articles and posts discussing the quality of
standing desks from publications and websites such as *The Wirecutter*, *Maximum PC*, *Digital*

*Trends*, and *PC Gamer*.  (*See id.* ¶¶ 53-61.)  Moreover, Next's own public advertising -- which included writing reviews of competitor's standing desks, republishing favorable reviews of its desks on its website, and responding to unfavorable reviews -- contributed to this public controversy.  (*See id.* ¶¶ 52-56, 62-68.)  *See Steaks Unlimited, Inc.*, 623 F.2d at 266-68 (finding existence of public controversy based solely on plaintiff's own extensive advertising campaign).  This debate impacted individuals outside of those immediately interested in the competitors' critiques of each others' desks through to consumers.  *See Steaks Unlimited, Inc.*, 623 F.2d at 266-68, 280 (advertising aimed at affecting consumer choice qualified as public controversy as it impacted individuals outside of those immediately interested).  Indeed, it was the consumers' eyes and ears that both the trade magazines and competitors' reviews obviously hoped to capture, whether in print or online.

Plaintiff does not directly dispute that a public controversy existed, but rather argues that this prong of the limited public figure test is not met because the controversy was created by defendant's own, allegedly defamatory statements.  This argument is effective as far as plaintiff takes it, since "those charged with defamation cannot, by their own conduct, create their own defense, by making the claimant a public figure."  *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979).  "This requirement ensures that a defendant cannot create its own controversy in order to claim First Amendment protection for its defamatory statements.  Rather, the defendant must have added its voice to the chorus that was already discussing the controversy."  *Quantum Elecs. Corp.*, 881 F. Supp. at 764 (internal quotations and citations omitted).  However, here, defendant produced articles in *The Wirecutter* from 2013 and 2015, both of which (1) discuss the quality of Next's and other's standing desks

23

and (2) long predate the allegedly defamatory statements made by defendant on its blog site.  Having only added its voice to those already participating in a broader debate about qualify, the defendant did not create the controversy.

### b.  Plaintiff's Role in Controversy

The next prong of the limited public figure test is whether the plaintiff plays more than a trivial or tangential role in the public controversy.  *See Harris,* 48 F.3d at 250.  This prong may be satisfied where a person has "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved."  *Bay View Packing Co.*, 198 Wis. 2d at 682 (quoting *Gertz*, 418 U.S. at 345).  For example, in *Steaks*, a retail meat company's ad campaign regarding its sales was held to have thrust plaintiff into the public debate regarding the quality of its meat.  *Steaks*, 623 F.2d at 273-74. Similarly, in *Quantum Electronics Corp.*, the court held that plaintiff had been an active participant in a public controversy over the health and safety risks of ozonators by reprinting reviews of its ozonator product in its promotional materials, sending promotional literature to prospective customers, and soliciting defendant's review of its products.  *Quantum Electronics Corp.*, 881 F. Supp. at 765.

Here, there can be little doubt on the factual record that plaintiff also inserted itself into the public controversy regarding the quality of standing desks, including its Terra and EvoDesk.  First, Next's own promotional materials made representations as to the quality of its desks.  Second, plaintiff highlighted positive product reviews of the Terra and the EvoDesk on its website, as well as actively contested negative product reviews by others. Third, plaintiff published its own reviews of competing products, including *defendant's*

standing desk.

Similarly, plaintiff's attempt to minimize its role in the controversy by reference to legal citations is unpersuasive. For example, *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583 (1st Cir. 1980), simply stands for the general proposition that "the mere selling of products" does not create a public controversy *per se,* and courts must make a particularized inquiry into the existence of a public controversy or public figure. *Id.* at 589-90. For reasons just explained, plaintiff does not survive such a particularized inquiry on this record. Moreover, *Bruno* is factually distinguishable. Although the plaintiff in that case was found *not* to be a public figure, the court specifically stated that other than the allegedly defamatory articles discussing the quality of plaintiff's boats, "we know little or nothing of ongoing private controversies, not to mention public ones." *Id.* at 591. In contrast, the defendant here has pointed to undisputed evidence of an ongoing, public debate regarding standing desks in which plaintiff actively participated.

### c. Defamatory Statements Germane to Controversy

The third and final prong asks whether the allegedly defamatory statements were germane to the public controversy identified. *See Harris,* 48 F.3d at 250. Here, the public controversy was over the quality of standing desks, including the Terra and EvoDesk review articles at issue. Accordingly, the alleged defamatory statements by defendant about those desks were made "in connection with and to emphasize" the discussion regarding the quality of standing desks, which could hardly be more germane to that public controversy.

In sum, because defendant has demonstrated that (1) a public controversy existed over the quality of standing desks; (2) plaintiff had thrust itself into that debate; and (3)

the alleged defamatory statements were germane to the controversy, the court is satisfied that plaintiff is a "limited public figure" for purposes of considering allegedly defamatory statements.  Accordingly, plaintiff can only prevail if it can prove that the allegedly defamatory statements were made with "actual malice."  *See Torgenson*, 210 Wis. 2d at 536; *New York Times Co.*, 376 U.S. at 279-80.

## 2.  Actual Malice

Defendant argues that no reasonable jury could find in plaintiff's favor because plaintiff has presented no evidence that any of its allegedly defamatory statements were made with actual malice.  (Def.'s Br. (dkt. #22) 22.)  To prove actual malice, a plaintiff must demonstrate that the defendant had knowledge that the statement was false or acted with reckless disregard of whether it was false or not.  *New York Times Co.*, 376 U.S. at 279-80.  "Knowledge of falsity means that the defendant was actually aware that the contested publication was false" while "[r]eckless disregard of the truth or falsity of a publication occurs when the defendant in fact entertained serious doubts as to its truth, or a high degree of awareness of its probable falsity."  *Harris*, 48 F.3d at 247 (internal citations, quotations, and alterations omitted).  "The focus is upon the defendant's attitude pertaining to the truth or falsity of the published statements rather than upon any hatefulness or ill-will."  *Van Straten v. Milwaukee Journal Newspaper-Publisher*, 151 Wis. 2d 905, 917, 447 N.W.2d 105, 110 (Ct. App. 1989) (citing *Cantrell v. Forest City Pub. Co.,* 419 U.S. 245, 252 (1974)).

Here, plaintiff alleges that defendant acted with actual malice in publishing the articles, but none of the facts asserted by plaintiff -- even accepted as true -- support a

reasonable finding that defendant subjectively *knew* that either of the two articles at issue contained actual falsehoods or had a high degree of awareness of its probable falsity.  First, plaintiff points out that Knighton acknowledged favorable reviews drive sales up *and* "highly ranked" negative reviews hurt sales.  (Pl.'s Opp'n (dkt. #31) 29.)  Yet Knighton's awareness of this commonsense fact does not demonstrate actual malice.  At most, this observation shows defendant's interest in competition, which is a given in many such limited public figure disputes.

Second, plaintiff references the fact that Knighton acknowledged receiving assembly instructions for the Terra desk, which describe its anti-collision and overload protections. (*Id.*)  Again, that Knighton received the assembly instructions does not prove he read them, nor that he was subjectively aware of the representations contained therein.  Even if a trier of fact could reasonably *infer* that he had, there is *no* dispute that Knighton performed his own tests to ascertain whether the Terra had an anti-collision system or overload protection, and he concluded from those tests that it did not.  Specifically, Knighton placed 360 pounds of weight on the desk to see if the overload protection would engage; pressed on the corners of the desk while the lifting mechanism was engaged to see if it had collision avoidance and would stop; and visually examined the desk and saw that it did not have an anti-collision dongle.  Although plaintiff disputes the objective accuracy and efficacy of these tests, it does not dispute that they occurred.

Certainly, viewing the facts in the light most favorable to plaintiff and accepting plaintiff's assertion that the tests were flawed, some of Knighton's pronouncements in and publication of the Terra article based on his flawed tests, and contrary to the

27

representations in plaintiff's instruction manual, could reasonably be found to constitute negligence.  However, "[n]egligence . . . is not enough" to constitute actual malice, and "[r]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *Woods v. Evansville Press Co.*, 791 F.2d 480, 485 (7th Cir. 1986) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). While actual malice may be found where the defendant failed to "investigate or independently verify disputed or questionable factual assertions," *id.*, here, whatever his other failings in analysis or conclusions, Knighton *did* independently investigate the existence of the anti-collision and overload protections.  And a failure not to investigate "enough" or to the satisfaction of the plaintiff does not remove a statement from the protection of the limited public figure privilege.  *See Biskupic v. Cicero*, 2008 WI App 117, ¶ 32, 313 Wis. 2d 225, 756 N.W.2d 649 (rejecting plaintiff's argument that defendants' failure to spend additional time investigating amounted to actual malice, and noting that the "[f]ailure to investigate an allegation, standing alone, is not sufficient to show subjective doubts exist").  On these facts, therefore, no reasonable factfinder could conclude that defendant "in fact entertained serious doubts as to its truth, or a high degree of awareness of its probable falsity." *Harris*, 48 F.3d at 247.

Third, plaintiff notes that Knighton admitted that he never contacted JieCang to confirm that the main purpose of its adoption of a two-board system was cost savings. Defendant asserts that Knighton had no obligation to confirm his own opinion as to JieCang's reasons for using a two-board system, especially having based that opinion on a conversation with an experienced electronics manufacturer, who explained the reason for

using the system would primarily be for cost savings.  (Def.'s Supp. PFOF (dkt. #40) ¶ 15.)  This provided at least a reasonable basis for defendant's statement regarding use of the two board system in the article, and regardless, defendant's failure to confirm his opinion with JieCang is not enough for a reasonable trier of fact to find actual malice.

Fourth, plaintiff points out that defendant never actually tested any accessories on the EvoDesk.  In response, defendant maintains that its statement that the placement of the EvoDesk frame is "a problem for users who plan to mount accessories" is true. Moreover, defendant was not required to test or mount accessories to conclude based on Knighton's own expertise that doing so could be problematic based on the EvoDesk design.

Fifth, plaintiff points out that Knighton admitted he does not level standing desks before testing their stability.  One could perhaps infer that the desks would have been more stable if he had done so, but again even granting this inference, plaintiff fails to explain how Knighton's failure to level the desks would permit a reasonable trier of fact to find that defendant's statements were made with actual knowledge of their falsity or reckless disregard for the truth.

Finally, plaintiff notes that Knighton testified that he did not remember whether Christopher, a Next representative with whom he spoke on the phone, stated he was with management.  Still, this testimony does not conflict with Knighton's statement in the Terra article that "[i]t wasn't until I called and left a message for management that someone at NextDesk acknowledged [information on its website] was incorrect."  (Compl., Ex. A (dkt. #2-1) 3.)  Indeed, consistent with the statement in the article, Knighton testified in his deposition that he "left a voice mail for management to call," and Christopher called him

back and apologized.  (Knighton Dep. (dkt. #31-12) 185:21-186:18.)

In sum, even accepting plaintiff's proposed facts as true, it has failed to proffer sufficient evidence for a reasonable jury to find that defendant acted with actual malice in making the statements at issue in the Terra or EvoDesk articles.  Therefore, plaintiff's defamation claims are not actionable and will be dismissed.

## B. Tortious Interference with Existing or Prospective Contracts

This leaves plaintiff's claims that defendant's publication of the Terra article and EvoDesk article tortuously interfered with plaintiff's existing and prospective contractual relations.  Defendant argues that plaintiff's claims must fail because:  (1) there is no evidence of a contract or prospective contractual relationship with any third party; (2) the statements contained in the articles are protected by the privilege of honesty; (3) the statements contained in the articles are matters of public concern and are, therefore, protected by the constitutional privilege; and (4) BTOD and Next are competitors, and BTOD's statements are protected by the competition privilege.  (Def.'s Br. (dkt. #22) 27-29.)

Given the court's earlier discussion of the constitutional public figure privilege, the court will again begin with defendant's third argument.  Defendant does not cite to, nor could the court locate, any controlling case specifically applying the public figure privilege to tortious interference claims.  However, case law *does* suggest that the privilege extends beyond the defamation context.  In *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988), the Supreme Court held that "public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications . . . without

showing in addition that the publication contains a false statement of fact which was made with 'actual malice.'" *Id.* at 56.  As one circuit court observed, "[f]ollowing the Supreme Court's lead in *Falwell,* the circuit courts have likewise imposed the actual-malice standard on other tort claims predicated on defamatory speech, recognizing that a plaintiff may not avoid the protection afforded by the Constitution . . . merely by the use of creative pleading." *Compuware v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 530 (6th Cir.2007) (internal quotations omitted); *see also Unelko Corp. v. Rooney*, 912 F.2d 1049, 1058 (9th Cir. 1990) (holding that plaintiff's tortious interference claims and product disparagement claims were "subject to the same first amendment requirements that govern actions for defamation"); *Jefferson County Sch. Dist. v. Moody's Investor's Services, Inc.*, 175 F.3d 848, 856-58 (10th Cir. 1999) (rejecting tortious interference claims based on speech protected by the First Amendment); *Beverly Hills Foodland, Inc. v. United Food and Commercial Workers Union, Local 655*, 39 F.3d 191, 196 (8th Cir. 1994) (holding that the actual malice standard required for an actionable defamation claim "must equally be met for a tortious interference claim based on the same conduct or statements").

While the Seventh Circuit appears not to have yet applied the constitutional public figure privilege to tortious interference claims, it has extended other First Amendment doctrines to provide a privilege against claims of tortious inference.  *See Havoco of Am., Ltd. v. Hollobow,* 702 F.2d 643, 649 (7th Cir.1983) (applying *Noerr-Pennington* doctrine to protect the First Amendment right to petition the government for redress against claims of tortious interference with business relationships).  Accordingly, the court concludes that the First Amendment public figure privilege applies to claims alleging tortious interference

31

with contractual relations.  Because the court concluded above that the privilege applies here, and that plaintiff has failed to proffer evidence of actual malice to overcome the privilege, plaintiff's tortious interference claims must also be dismissed.

ORDER

IT IS ORDERED that:

1)  Plaintiff Next Technologies, Inc.'s, motion to amend its complaint (dkt. #25) is DENIED.

2)  Defendant Beyond the Office Door's motion for summary judgment (dkt. #21) is GRANTED.

3)  Plaintiff's unopposed motion to extend certain deadlines (dkt. #44) is DENIED as moot.

Entered this 10th day of June, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge